This was a civil action, brought by the plaintiff to recover damages for personal injuries alleged to have been caused by the negligence of defendant, or its agents, while the plaintiff was in the employ of the defendant.
There was evidence on the part of the plaintiff tending to show that he was employed by the defendant, the Carolina Steel and Iron Company, on 24 June, 1920, and was at the time engaged in the performance of his work — that of an acetylene torch operator, welding and cutting iron of various kinds used in construction work; that he was engaged at the time of his injury in the building or factory of the defendant; that this factory was a large building; that he was cutting pieces of iron into various lengths with his torch, performing his work in front of a large door or entrance to said building. That in said building there was an overhead trolley-way, used for carrying iron of various kinds from the building out through the door, in front of which he was engaged at the time of his injury. That other employees of the company, wishing to remove a number of beams, or pieces of iron, from the building, had wrapped around them a chain, or chains, fastened to *Page 365 
said trolley, or run-way, and had hoisted them for the purpose of carrying them out through said door into the yard beyond. That as they were carrying said pieces of iron along by the overhead trolley, and as the same passed over the plaintiff, the chain or chains slipped and slackened, causing the ends of the long pieces of iron to fall or slip down upon the plaintiff's back, he being at work upon the ground and immediately underneath the overhead trolley, in front of the door. That he was knocked down, his back and spine hurt, and he suffered permanent injury.
There was evidence tending to show that there was no negligence on the part of the defendant or its agents; that the method for moving the iron approved and in general use was the one adopted by the defendant, and that if there was negligence on the part of defendant, the plaintiff was guilty of contributory negligence in placing himself in a dangerous position, under the trolley line, and in front of the door that was being constantly used. The defendant further set up the defense that the negligence, if any, was that of a fellow-servant.
There was evidence of the plaintiff, by the witness C. A. Walters, as follows: "I was in the shop on the morning Mr. Rierson was injured. I didn't see the angle irons when they fell. I saw them when he pulled them up, and saw them take Mr. Rierson from under them, and saw them immediately after they fell. I noticed the chain which was around them. It was a chain the hook of which was square, and was too large to go through the link and they hooked it around the link. They had been using that chain to my knowledge ever since I had been there at work for them, and had been using it for that purpose. I knew it had been slipping before and spilling loads. The method that is approved and in general use in plants like that of defendant for moving loads like the one that fell is to use two chains. They always used two chains where I worked. They have a large ring, and they have two chains fastened in that ring with a hook at the end of each chain. They take it out and put it around a load some six or eight feet apart, far enough apart to give the load a balance and keep it from slumping. I know what kind of chains are approved and in general use in factories like this for the purpose of lifting loads like this was on the trolley system. They use a large chain with a hook on it that will fit down tight around the load, with a hook on it large enough to go around the whole chain, and the chains that are approved and in general use have rings in them so that the hook can be put in the rings. The Carolina Steel and Iron Company, the defendant in this case, had two or three other chains. They had two or three there with rings in them. I had been there nearly three months before Mr. Rierson was hurt, and *Page 366 
to my knowledge they had been using this chain since then. I don't know how many times I have seen this chain slip, but I saw it slip several times."
There was a verdict for the plaintiff and judgment thereon, from which defendant appealed.
The defendant objected to testimony that there was a custom to use only one chain instead of two in moving material along the trolley, but when we examine the evidence relating to this question, we find that really what was meant by the "custom," and what counsel denominated such in his questions to the witnesses was evidently considered by the witness as equivalent to what was actually done on these several or numerous occasions, when he witnessed the operations of the trolley in carrying material from one place to another. If the plaintiff was seeking to prove a general custom, and exception was properly taken to his effort in doing so, plaintiff's counsel were not even moderately successful in showing such a custom, and the witness, who seemed to be very intelligent, and to understand the scope of the inquiry, when confined within its proper limits, gave an unobjectionable answer. For example, in answering the first question on this subject, he said: "Well, they were using only one chain; only custom I know." This can mean but one thing, and that is that defendant was using only one chain in moving the trolley from place to place when loaded with beams or pieces of iron. If evidence of the custom in operating the trolley was incompetent, and there was any substantial evidence of it, we would not reverse upon such a slight, or rather attenuated departure from the true line of inquiry, when we can well see, from the answers of the witness, that it could not have worked injury to the defendant. We repeat what was said in Brewer v. Ring, 177 N.C. 484: "Courts do not lightly grant reversals, or set aside verdicts upon grounds which show the alleged error to be harmless, or where the appellant could have sustained no injury from it. There should be at least something like a practical treatment of the motion to reverse, and it should not be granted except to subserve the real ends of substantial justice. Hilliard on New Trials (2 ed.), secs. 1 to 7. The motion should be meritorious and not based upon merely trivial errors committed manifestly without prejudice. Reasons for attaching great importance to small and innocuous deviations from correct principles have long ceased to have that effect, and have become obsolete. The law will not now do a vain and useless thing." *Page 367 S. v. Smith, 164 N.C. 476. The sum and substance of what the plaintiff, as his own witness said, and intended to say, was that defendant always used only one chain, when two chains were necessary to balance the trolley and prevent it from capsizing, as it did, and this assertion becomes more reasonable if not shown conclusively to be a correct one, when there is evidence to show that such trolleys are approved and in general use in other similar factories, and the only safe kind. But it would seem from the peculiar construction of the trolley and the uses to which it was applied that there should have been some contrivance to keep it on a balance, or in an upright position, so that it would not careen, or incline to one side, or lie over, and precipitate its load to the ground. If there was nothing to hold it straight, or on a level, just such a result as follows in this instance was the one most likely to ensue, just as a ship sailing on the wind is apt to get off its keel if there is no counteracting force applied to it. It was apparently a dangerous method of doing the kind of work the defendant was engaged in at the time.
Defendant complains that the judge did not follow the rule laid down in our cases as to the duty of the employee to his employer, and especially as it relates to his primary obligation to use ordinary care in providing a reasonably safe place to do his work, and reasonably safe and proper tools with which to do it. Smith v. R. R., 182 N.C. 296. But we think otherwise. It is an almost universal rule of the law that the charge of the judge must be taken as a connected whole; that is, it must be considered and construed in its entirety, and not by the process of selecting one portion as the object of attack when, if it is viewed in the light of its relation to all that was said by the judge, a very different meaning would clearly be revealed.
Applying this rule to the charge in question, his Honor gave the following instruction as embodying a principle applicable throughout the case, as it relates to the master's duty to exercise ordinary care, or not to be negligent, which itself means the absence of proper and commensurate care. He said: "The general rule is that those entering into the service of a common master become thereby engaged in a common service, and are common servants, and prima facie the common master is not liable for the negligence of one of his servants, which has resulted in an injury to a fellow-servant. There are, however, some duties which a master owes, as such, to a servant entering his employment. He owes the duty to provide such servant with a reasonably safe place to work in, having reference to the character of employment in which the servant is engaged. He also owes the duty of providing reasonably safe tools, appliances, and machinery for the accomplishment of the *Page 368 
work necessary to be done. He must exercise proper diligence in the employment of reasonably safe and competent men to perform their respective duties. If the master be neglectful in any of these matters, it is a neglect of a duty which he personally owes to his employee, and if the employee suffers damage on account thereof, the master is liable. If, instead of personally performing these obligations, the master engaged another to do them for him, he is liable for the neglect of that other, which, in such cases, is not the neglect of a fellow-servant, no matter what his position as to other matters, but is the neglect of the master to do those things which it is the duty of the master to perform, as such." It will also be seen by a careful and intelligent consideration of the charge, such as the jury are supposed to have given it, that his Honor, in other parts of the charge, clearly and explicitly stated that the obligation was one of ordinary care in performing his duty to his servant, and not altogether an absolute duty, or one which may be performed regardless of the element of care. Marks v. Cotton Mills, 135 N.C. 287, approved in S.c., 138 N.C. 401. Having laid down this as the all-pervading rule, instead of the one imposing an absolute duty in this respect, as supposed by the defendant, he proceeded then to charge more particularly concerning the master's duty, as follows: "While the master is not held to the requirement of guaranteeing the safety of his workmen, or those engaged to work for him, in a factory of this kind, it is, nevertheless, his duty to provide for them reasonably safe tools and machinery, and a reasonably safe place to work, and to keep them in such condition as to afford reasonable protection, and this duty being one personally required of him, he may not delegate it to another and escape liability for damages, if neglect of duty by the latter proximately causes injury to the servant while in the performance of his duties." And, again, instructing the jury respecting the master's primary duties owing to his servant, he said: "There are, however, some duties which a master owes as such to a servant entering his employment. He owes the duty to provide such servant with a reasonably safe place to work in, having reference to the character of employment in which the servant is engaged. He also owes the duty of providing reasonably safe tools, appliances, and machinery for the accomplishment of the work necessary to be done. He must exercise proper diligence in the employment of reasonably safe and competent men to perform their respective duties. If the master be neglectful in any of these matters it is the neglect of a duty which he personally owes to his employee, and if the employee suffers damage on account thereof, the master is liable. If instead of personally performing these obligations the master engaged another to do them for him, he is liable for the *Page 369 
neglect of that other, which, in such cases, is not the neglect of a fellow-servant, no matter what his position as to other matters, but is the neglect of the master to do those things which it is the duty of the master to perform, as such."
It will be noted that his Honor uses a broad and sweeping expression (intended to cover and include every duty he had enumerated in the earlier portion of his charge) by the use of these terms: "If the master be neglectful in any of these matters, it is the neglect of a duty owing to his servant"; and, moreover, "the neglect is one he personally owes to him." It will be observed here that he repeated what he had formerly said in opening his charge, that the standard and measure of the master's liability is his neglect (or a failure to use ordinary care) as to any of those duties which he had recited, and he added that it would be such neglect as would impose liability upon him for any damage proximately caused by it.
We must say, in justice to the court, that the charge was carefully prepared and delivered, and should receive from us not a too liberal nor yet a too restricted construction, but a fair and sensible one, or such a one as we must infer from the clearness of its language an intelligent jury fully understood. If we acted upon any other principle, we would violate one of the cardinal and most practical rules in the law governing the granting of new trials, which is, in fact, but a corrolary from what we have already said of them, and which we may well repeat in substance.
The foundation of the application for a new trial is the allegation of injustice, and the motion is for relief. Unless, therefore, some wrong has been suffered, there is nothing to be relieved against. The injury must be positive and tangible, not theoretical merely. For instance, the simple fact of defeat is in no sense injurious, for it simply wounds the feelings or disappoints expectations. But this alone is not sufficient ground for a new trial. It does not necessarily involve loss of any kind, and without loss, or the probability of loss, there can be no new trial. The complaining party asks for redress, for the restoration of rights which have first been infringed and then taken away. There must be, then, a probability of repairing the injury, otherwise the interference of a court would be nugatory. There must be a reasonable prospect of placing the party who asks for a new trial in a better position than the one which he occupies by the verdict. If he obtains a new trial he must incur additional expense, and if there is no corresponding benefit he is still the sufferer. Besides, courts are instituted to enforce right and restrain wrong. Their time is too valuable for them to interpose their remedial power idly and to no purpose. They will only interfere, therefore, when there is a prospect of ultimate benefit, and in a practical *Page 370 
sense, some wrong has been done which calls for redress. 3 Graham and Waterman on New Trials, 1235; Hulse v. Brantley, 110 N.C. 134; Alexanderv. Savings Bank, 155 N.C. 124; McKeel v. Holloman, 163 N.C. 132. See, also, Grice v. Ricks, 14 N.C. 62; Gray v. R. R., 167 N.C. 433; Brewerv. Ring, supra; S. v. Smith, supra.
Having fully and carefully considered the defendant's exceptions, we find that no error appears in the case.
No error.